The **UNITED STATES** of America, for the Use and Benefit of Thomas D. SLIGH and M. L. Shaw, partners, d/b/a Sligh Plumbing & Heating Company, Plaintiffs,

v.

**FULLERTON CONSTRUCTION COMPANY** and Continental Casualty Company, Defendants.

Civ. A. No. 66-826.

United States District Court
D. South Carolina,
Columbia Division.

Aug. 12, 1968.

Edgar L. Morris, Columbia, S. C., for plaintiffs.

Michael H. Quinn, of Fulmer, Barnes, Berry & Austin, Columbia, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HEMPHILL, District Judge.

This action was instituted by the Use-Plaintiffs, Thomas D. Sligh and M. L. Shaw, d/b/a Sligh Plumbing and Heating Company, to recover of defendant pursuant to Title 40 U.S.C.A. Section 270a et seq., commonly referred to as the Miller Act. The complaint alleges that on or about December 28, 1964, defendant entered into a written contract with Use-Plaintiff by the terms of which Use-Plaintiff was to perform that part of the contract described as Plumbing for the sum of Nine Thousand Four Hundred and No/100 ($9,400.00) Dollars and with additional work the total price was raised to Nine Thousand Six Hundred Fifty-Eight and 65/100 ($9,658.65) Dollars. That between December 14, 1964 and September 15, 1966, Sligh, at the special instance and request of the defendant did supply labor and installed plumbing supplies and materials, all of which were used in the prosecution of the work described in the principal contract. The complaint further states that after allowing all credits that the balance remaining due and unpaid is the sum of Two Thousand Six Hundred Seventy-One and 24/100 ($2,671.24) Dollars, and that appropriate notices were served by plaintiff upon defendant in compliance with the statute.

Fullerton, in its answer pleads a general denial, denies any additions to the contract price of Nine Thousand Four Hundred and No/100 ($9,400.00) Dollars, and further alleges that the work performed by Sligh was only worth Six Thousand Nine Hundred Eighty-Seven and 41/100 ($6,987.41) Dollars; and for a second defense alleges that Sligh did not furnish all of the labor and materials as agreed and as a result it had to spend the sum of Two Thousand Four Hundred Twelve and 59/100 ($2,412.59) Dollars and alleges this amount as a recoupment by reason of breach of contract.

Prior to trial, the defendant conceded the amount of Two Hundred Fifty-Eight and 65/100 ($258.65) Dollars as an extra claimed by Sligh and abandoned an alleged back-charge of One Hundred Twenty-Seven and 35/100 ($127.35) Dollars for repairs to the sump pump, whereupon the court entered an Order awarding plaintiff these sums, and, in addition awarding plaintiff's attorney a fee of Seventy-Five and No/100 ($75.00) Dollars. with interest thereon from September 15, 1966, together with costs and disbursements. The entire amount has been paid and satisfaction entered with the Clerk of Court.

The case was heard at Columbia, South Carolina, without a jury pursuant to Rule 39(b) F.R.Civ.P. The court now finds the facts specially and states conclusions of law thereon, in accordance with Rule 52(a) F.R.C.P., as follows:

### FINDINGS OF FACT

1. On 30 October 1964 Fullerton Construction Co., Post Office Box 4216, Sacramento, California, entered into a contract with the U. S. Army Engineers for construction of a Central Heating and Refrigeration Plant at Fort Jackson, South Carolina. The contract price was $938,000.00. On the same day Continental Casualty Company entered

into agreement with the parties as surety and furnished its indemnity bond in the principal amount of $469,000.00.

2. Shortly after this contract was entered into defendant began work on the general contract and contact was had between Use-Plaintiff and defendant as to the "plumbing" which the parties agreed would be performed by Use-Plaintiff. Partner Shaw of plaintiff was shown two schematic record drawings[1] as representative of the work involved. One of these was labelled "Plumbing Plan" and another "Plumbing Details and Riser Diagrams." Shaw thereupon made a "take-off" in which he calculated cost, etc. and came up with a figure of $9400.00.

3. It is uncontradicted that Shaw bid on the work before seeing or signing a contract. He bid on the work as shown on the two record drawings and his calculations[2] reflect:

```
Shower Pan.                                                   110.00
Foundation Drain

3"-1X11 1X11 11X1 111    4'L1
Floor Drains-Type 216 w/clamp. device 2-7.70
                              3-11.50 4-20.65   213.20
Shower Drains - "          "                       8.00
2"- 1X11 11X1
Hub Drains - C.I. Pipe                             40.00
3"- 1111 11       4"-111      (261.00)
Roof Drains - Internal Exp. Joint-Cast Brass or
             Copper sleeve type                   290.00
1 Sump Pumps:  Duplex Non Clog-                   799.00
1111 Hose Faucetts: Type 65- 1/2"                   4.00
1111 Wall-Hydrants-Type. 205    11.90    12.20     48.80
1 P-1- Water Closet - VS-14-38.60                  38.60
1 P-2- Urinal-VU13W          62.50                 62.50
1 P-3- Lav.-EL20B.Type. 108 "P" Trap.Fty type 14DW-
                            Sup-Type TV.            35.35
1 P-4- Service Sink          82.10                 82.10
1 P-5-                      148.50                148.50
1 P-6                        52.80                 52.80
1 P-7                        68.00                 68.00
                          Labor:
170' Foundation Drainage -  70.00                 255.00
     Rough -     Rough              Equip.       2,255.85
     Sump-      210.00   140.00     Rough        2,280.00
7 R.D. -        560.00   420.00     Labor        1,850.00
29 Drain -     1160.00   870.00     S.S.           185.00
7 F.X.          350.00   350.00                 $6,570.00
```

$9400.00

---

1. Plaintiff's exhibits 7 and 8 in the trial record.

2. Plaintiff's trial exhibit No. 9.

4. After plaintiff had begun work on the basis of the record drawings and the oral bid of $9400.00, on December 22, 1964 plaintiff, over signature of Shaw wrote to Fullerton:

Fullerton Construction Co.
Fort Jackson, S. C.

Re: Plumbing-Central Heating Plant

Gentlemen:

We propose to furnish and install the plumbing in the above referenced job, in accordance with plans and specifications, for the amount of $9,400.00 (nine thousand four hundred dollars).

Trust this will meet with your approval.

Yours very truly,

SLIGH PLUMBING & HEATING CO.

M. L. Shaw

This price *does not* include water meter, if required.
This price *does not* include excavation for foundation drainage.

Accepted:
Date _____
By _____
Title _____

———————◆———————

5. In reply to this letter Fullerton sent a written contract form to Use-Plaintiff, who signed the agreement on January 5, 1965. The trial file reflects that defendant Fullerton accepted Use-Plaintiff's offer of December 22, 1964 on December 28, 1964.[3] The record reflects also that Use-Plaintiff considered the written acceptance as of that date. Plaintiff did not participate with defendant as a sub-contractor in the preparation of the original bid on which the contract was awarded to defendant by the U. S. Government on October 30, 1964, and did not receive nor was it furnished with a complete set of plans and specifications for the job by defendant.

6. The plaintiff completed its work for defendant on September 15, 1966 without installing or connecting with street lines.

7. The written contract of December 28, 1964 between the parties incorporates by reference Section 30—"Plumbing" of the specifications as being descriptive of the work to be performed by plaintiff. The specifications (Section 30) describe the plumbing work to be performed by plaintiff including the connection of its completed work "5 feet outside the building" and there are no specifications in this Section which spell out the detailed requirements for the installation of a six (6″) inch raw water line (or "street mains").[4]

3. Part of plaintiff's trial exhibit #2.

4. 30–01. SCOPE: "This section covers all plumbing, complete, and the exterior underground water and drainage utilities specifically shown on mechanical site plan drawing of central heat and refrigeration plant, including drains from cooling towers, make-up water to cooling towers, and drains from blow-off tank and fuel oil tank."

30.03. GENERAL: "The general arrangement of the plumbing shall be as indicated on the drawing. Detailed drawings of the proposed departures due

8. There is another provision of the specifications (Section 51—"Water Lines") which fully describe the installation of raw water lines "at a point approximately five (5) feet outside of all buildings and structures to which service is required," as well as the requirements as to quality and strength of pipe, fittings, and describes the installation of six (6″) inch raw water lines.[5]

Reference to Section 30, Section 50 and the record drawings indicate the cause for confusion which ultimately resulted in this lawsuit.

9. In the plumbing and heating trade the installation and placement of raw water lines (or street mains) is not regarded as "Plumbing Work" but rather as "Utility Work."

10. In construing construction contracts, the specifications take precedence over the drawings, and in interpreting specifications, reliance cannot be made on a single excerpted phrase or passage, but they must all be taken as a whole.

11. Plaintiff concedes that it did not connect up its completed work to the raw water lines (or street mains), as required by Section 30 of the specifications, since the raw water lines were not in place, and that defendant would be entitled to a credit of $65.00 against the amount sued for.

## CONCLUSIONS OF LAW

A. Despite the lack of usual jurisdictional amount, the court has jurisdiction of the parties and the subject matter of the action. The rights and duties of the parties, as well as the jurisdictional feature, are controlled by the provisions of the Miller Act, 40 U.S. C. § 270a et seq.

B. It appears that the agreement between the litigants was one which among contractor and subcontractor was capable of being understood in more senses than one by the nature of the dealing of the parties. An ambiguous contract is one capable of being understood in more senses than one, an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning. Profett v. Sitton, 244 S.C. 206, 136 S.E.2d 257 (1964). Perhaps the record drawings in themselves were unambiguous [and provided no street lines], or the written contract of

---

to actual field conditions or other causes shall be submitted for approval. The Contractor shall carefully examine the drawings and shall be responsible for the proper fitting of materials and equipment in each building as indicated, without substantial alteration."

*a. Utilities.* Water and drainage piping shall be extended 5 feet outside the building except as hereinbefore provided and unless otherwise indicated on the drawings, where it shall be capped or plugged. Utilities shall be installed below the frostline. If the trenches are closed or the pipes otherwise covered before being connected to the street mains, the location of the end of each plumbing utility shall be marked with a state or other acceptable means.

*b.*, etc.

5. 51.01. SCOPE: "This section covers water to building services at a point approximately five (5) feet outside of all buildings and structures to which service is required, complete."

51.05. GENERAL: "Piping for water mains and building service connections may be of any of the types and materials specified herein. The pipe and accessories shall be new and unused unless otherwise approved. * * *"

51-05. CAST-IRON PIPE:

"a. *Material.*

(1) *Cast-Iron Pipe 3 Inches and Larger* shall conform to the American Standard A21.2, A21.6 or A21.8, working pressure 150 psi, or to Federal Specification WW-P-421, types I, II and III (which are bell-and-spigot, roll-on joint and mechanical joint, respectively), class 150, except that the pipe may be furnished of higher strength iron, in which even the table in Federal Specification WW-P-421 will not be applicable, and per paragraph 6.4″, the design strength is to be computed by American Standard Association Specification A21.1. Approved joints designed to lock rubber ring gaskets against displacement without calking may be used. In no case will a wall thickness of less than 0.35 inch be acceptable."

December 28 [January 5] if one construes only as to reference Section 30 of the Specifications, but the tender letter of December 22nd [accepted December 28th] speaks of "plans and specifications" without limit and without designation of specification 30 alone. Indeed, if the "service lines" [identical with street mains] [6] are not separate from the plumbing, why are they not included in specification 30?

■ C. Where a written instrument is ambiguous, parol testimony is admissible to show its true meaning. Breedin v. Smith, et al, 126 S.C. 346, 120 S.E. 64, Devore v. Piedmont Ins. Co., 144 S.C. 417, 142 S.E. 593, Proffett v. Sitton, supra.

■ The January 5, 1965 contract between the parties incorporates by reference a provision of the specifications as defining the work to be performed thereunder, but these specifications are vague, indefinite and susceptible of more than one meaning as to the chief point of contention, to wit: the placement and installation of a 6″ raw water line. Therefore the court relies to some extent on oral testimony to determine a just interpretation and not for the purpose of varying or altering the terms of a contract. Eureka Elastic Paint Co. v. Bennett-Hedgepeth Co., 85 S.C. 486, 67 S.E. 738; Charles, et al v. B & B Theatres, 234 S.C. 15, 106 S.E.2d 455; Bruce v. Blalock, 241 S.C. 15, 127 S.E.2d 439.

■ D. The plaintiff in submitting its quotation restricted its consideration of the work to the two pages of plans which were supplied by the defendant, who furnished no other data, plans or specifications, all of the work was to be performed under the provisions of Section 30—Plumbing, and the later reduction of this oral agreement to a writing did not vary the intentions of the par-

ties from restricting the scope of plaintiffs' work to the two sheets in question. Section 30 of the specifications mentions raw water lines [or street mains] only inferentially, while another section of the specifications [Section 51 Water Lines] sets forth the requirements of raw water lines [or street mains] clearly and in great detail. Defendant's testimony as to the pipe specifications in Section 30 merely indicates that plaintiffs work would be compatible with the work of others in producing a completed project. It was further testified that the placement and installation of six (6″) inch water lines was not the usual work of plumbers, but rather that of another trade. The attempt to the defendant to insist upon the placement and installation of the six (6″) inch raw water line by plaintiff does violence to the intent of the provisions of Section 30—"Plumbing" when applying the rules of interpretation of construction contracts as confirmed by the witnesses for both plaintiffs and defendant. It is not disputed that plaintiff *commenced* the work on the basis of the oral understanding reached after consideration of the *record drawings only*. The later contract(s) which referred to specifications having separate sections for "plumbing" and "service lines" affirms the delineation understood and followed by plaintiff. There is an absolute lack of evidence of bad faith on part of plaintiff or defendant.

■ E. This court adjudges that Use-Plaintiff has fullfilled the work it agreed to undertake for $9400.00, and is entitled to recover a balance due of $2285.24, plus interest, and less $65.00 offset to defendant for plaintiff's failure to make connections at the five foot line of demarkation.

And it is so ordered.

6. Specifications are plaintiff's trial Exhibit #5 and the particular Section is 51-08.